UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MAS WHOLESALE HOLDINGS LLC,

              Plaintiff,

        - against -                   **MEMORANDUM & ORDER**
                                   19-CV-1294 (PKC) (VMS)

NW ROSEDALE INC., NW CO OP CITY
INC. a/k/a NW OF CO OP CITY LLC, A&A
WHOLESALE HOLDINGS LLC,
MAHAMMAD ASHRAF, and AJAY SARIN,

              Defendants.
------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff MAS Wholesale Holdings LLC seeks a court order finding Defendants NW

Rosedale, Inc., NW Co op City Inc., A&A Wholesale Holdings LLC, Mahammad Ashraf, and

Ajay Sarin in contempt for their failure to abide by the parties' consent decree (the "Consent

Decree"), which was so-ordered by the Court in April 2020 (*see* Dkt. 42).  For the reasons set forth

in the ensuing Memorandum and Order, the Court grants in part the motion for contempt, and

orders Defendants to (1) immediately comply with the Consent Decree and the terms of this Order,

including by issuing the disclaimer as described *infra*, (2) compensate Plaintiff for three quarters

(3/4) of the attorneys' fees it has expended in this action, and (3) pay a daily fine to the Court as

described below until Defendants are in total compliance with the Consent Decree issued in this

case and the instant Order.

## BACKGROUND

### I.    The Underlying Proceedings

In 2018, NSC Wholesale Holdings, LLC ("NSC"), the parent company of National

Wholesale Liquidators ("NWL"), a large regional chain of stores founded in 1984, filed for

bankruptcy.  (Declaration of Noah Rosen in Support of Plaintiff's Motion for Contempt ("Rosen

Decl."), Dkt. 44-1, ¶¶ 3–5.) At the bankruptcy auction, Plaintiff purchased various assets of NSC, including two stores, and "[a]ll of the [d]ebtor's intellectual property." (*Id.* ¶ 8.) Defendants purchased the leases for two former NSC stores: one at 691 Co Op City Boulevard, Bronx, New York 10475 (the "Co-Op Store"), and the other at 253-01 Rockaway Boulevard, Rosedale, New York 11422 (the "Rosedale Store"). (*Id.* ¶ 13.)

After the bankruptcy auction, however, Defendants continued to use signage and slogans associated with the NWL brand. (*Id.* ¶¶ 18–28.) In response, in March 2019, Plaintiff filed this action, asserting violations of the Lanham Act, New York General Business Law, and New York common law, alleging, among other things, trademark infringement, deceptive practices, and unfair competition, and seeking damages and injunctive relief. (*Id.* ¶ 34; *see also* Complaint, Dkt. 1.)

After several discovery disputes, the parties reported on April 7, 2020 that they had reached a settlement and executed a confidential settlement agreement (the "Settlement Agreement"). (Notice of Settlement, Dkt. 40.) On April 13, 2020, the parties submitted a stipulation of dismissal with a proposed consent decree attached. (Dkt. 41.) The following day, the Court so-ordered the Consent Decree and dismissed the case. (Consent Decree, Dkt. 42.)

## II. Consent Decree and Settlement Agreement Terms

The Consent Decree provided, among other things, that Defendants are enjoined from:

- Using any of the following trademarks: Registered Trademark NW NATIONAL WHOLESALE . . . ; Registered Trademark NATIONAL WHOLESALE LIQUIDATORS . . . ; Registered Trademark THE HOUSEHOLD WAREHOUSE . . . ; and common law trademark SO MUCH FOR SO LITTLE; or any reproduction, counterfeit, copy, or colorable imitation of said marks or any confusingly similar marks in connection with the selling, supplying, marketing, advertising, importing, offering, distributing, and/or purchasing of any goods or services . . . [as well as] in any manner likely to cause others to believe that Defendants and their goods and/or services are connected with Plaintiff or [NWL];

- Making any false or misleading statements regarding Plaintiff or its products or [NWL], or the relationship between Plaintiff or [NWL] and Defendants;

- Committing any other actions or omissions calculated to cause consumers to believe that Defendants' goods or services are genuine goods or services of Plaintiff or [NWL]; [and]

- Using the word "NATIONAL" singly or as part of a name/mark in connection with the selling, supplying, marketing, advertising, importing, offering, distributing, and/or purchasing of any goods or services after October 1, 2020 (unless "NATIONAL" is included in the mark of an unaffiliated third party . . . )[.]

(*Id.* at ECF 2–3.[1])  The Consent Decree also provided that Defendants could continue to use the trademark "USA NATIONWIDE WAREHOUSE," and provided that Defendants would compensate Plaintiff for attorneys' fees incurred in enforcing the decree and Settlement Agreement.  (*Id.* at 1, 3, 4.)

The Settlement Agreement that the parties executed on April 3, 2020 (Settlement Agreement, Dkt. 52-2) contained the following provisions:

1. The Parties shall execute the consent decree annexed hereto and made part hereof as Exhibit A (hereinafter the "Consent Decree") and submit same to the Court for entry within five (5) days of the receipt of the payment referenced in Paragraph 2, below.  The terms of the Consent Decree as ultimately entered by the Court are herein incorporated by reference;

3. The Defendants and successors in interest hereby recognize and acknowledge Plaintiff's ownership rights in and to the Trademarks nationwide and all of the goodwill associated therewith.  Further, they acknowledge and agree that the Trademarks and all other foreign and domestic registrations and/or applications comprising or incorporating the Trademarks, are famous, valid, enforceable, subsisting, and held by Plaintiff.  Defendants and their successors in interest and present and future subsidiaries agree not to hereafter challenge or contest, directly or indirectly, the validity, ownership or registration of any of the Trademarks or any other trademark held by Plaintiff, including in any proceeding of any type in any country;

4. The Defendants shall immediately cease and for perpetuity refrain from selling, supplying, marketing, advertising, importing, offering, distributing, and/or

---

[1] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

3

purchasing any goods or services under any of the Trademarks or any names or marks confusingly similar to the Trademarks or otherwise infringing on or counterfeiting any of the Trademarks;

5. Defendants shall cease and for perpetuity refrain from using the element "NATIONAL," whether singly or together with other elements, in connection with the selling, supplying, marketing, advertising, importing, offering, distributing, and/or purchasing of any goods or services after October 1, 2020. This provision shall not be construed to prohibit Defendants from selling goods bearing the marks of unaffiliated third parties which include the element "NATIONAL" on the goods' original labelling as delivered to Defendants;

11. In the event of a breach of this Agreement, the Defendants acknowledge that recovery of damages will not be a sufficient legal remedy and agree that Plaintiff shall be entitled to injunctive relief and specific performance in addition to any and all other remedies, legal or equitable, to which it may be entitled;

14. A breach of this Agreement shall render Defendants liable to Plaintiff for any and all damages and injuries incurred by Plaintiff as a result thereof, and shall obligate Defendants to account to Plaintiff and turn over to Plaintiff any and all monies, profits, or other consideration or benefits which Defendants derive from any and all actions or omissions in breach of this Agreement and/or the Consent Decree, without prejudice to any other legal or equitable rights or remedies that Plaintiff may have;

15. The Defendants shall be jointly and severally liable for any breach of this Agreement and/or the Consent Decree; [and]

16. Defendants shall compensate Plaintiff for all attorneys' fees Plaintiff incurs in enforcing this Agreement and/or the Consent Decree and their terms[.]

(Settlement Agreement, Dkt. 52-2, ¶¶ 1, 3–5, 11, 14–16.)

## III. Defendants' Alleged Violations of the Consent Decree/Settlement Agreement

On October 14, 2020, Plaintiff visited Defendants' stores, and found multiple instances of signage that it alleges violated the terms of the Consent Decree. (Rosen Decl., Dkt. 44-1, ¶¶ 41–43.) These instances include, but are not limited to:

- Signs at Defendants' store locations that said "National Warehouse" and "USA National Warehouse;"

- A store sign with Plaintiff's slogan, "So much for so little;"

4

- Merchandise at both stores bearing placards and pricing stickers with the name "NW Stores;"

- Merchandise displays throughout both stores featuring placards advertising sale prices with the name "National Warehouse;"

- Furniture for sale at the Rosedale Store bearing signs stating "National Delivers," with the words "Wholesale Liquidators" blacked out between "National" and "Delivers";

- Aisle banners at the Co-op Store displaying the name "National Warehouse;"

- Signs at the Co-op Store designating departments as "National Eyecare" and "National Wireless";

- Signage for the Co-op Store shopping center with the name "National Liquidators," with the word "Liquidators" partially obscured;

- Merchandise at the Co-op Store with pricing stickers and placards bearing the name "National Warehouse;" and

- A Black Friday sale banner at the Co-op Store with the word "National."

(Rosen Decl., Dkt. 44-1, ¶¶ 42–43; *see also* Dkts. 44-6, 44-7, 44-10, 44-15, 44-17, 44-18, 44-19, 44-23, 44-24, 44-27, 44-28, 44-31.)   These violations continued essentially unabated through January 3, 2021.   (Rosen Decl., Dkt. 44-1, ¶ 44.)

**IV.    Procedural History of the Instant Motion**

On January 4, 2021, Plaintiff filed the instant motion for contempt, seeking sanctions against Defendants as well as attorneys' fees.[2]   (Plaintiff's Memorandum in Support of Motion for Contempt ("Contempt Mot."), Dkt. 44-32.)   On January 8, 2021, the Court ordered Defendants to respond to the motion by January 15, 2021.   (1/8/2021 Docket Order.)   On January 15, 2021,

---

[2] Plaintiff initially filed the contempt motion *ex parte*.   (*See* Dkt. 44.)   The following day, the Court ordered Plaintiff to explain why it should be permitted to proceed *ex parte* (1/5/2021 Docket Order), and subsequently unsealed the motion when Plaintiff indicated that it had not intended to proceed *ex parte* (1/8/2021 Docket Order; *see* Dkt. 45).

Defendant requested a 30-day extension of time to respond (Dkt. 46), and the Court extended the deadline by two weeks, until January 29, 2021 (1/15/2021 Docket Order). Defendants failed to file their response by January 29, 2021. On February 1, 2021, Plaintiff moved for Defendants to be held in contempt for their failure to respond, and the Court initially entered an order finding the original contempt motion unopposed. (*See* Dkt. 47; 2/1/2021 2:12 PM Docket Order.) Later that same day, Defendants filed a letter asking the Court not to treat the motion as unopposed, indicating that they had not yet filed their opposition because counsel for Defendants had been traveling internationally, but that Defendants intended to file their response later that day. (Dkt. 48.) The Court permitted Defendants to file their response (2/1/2021 3:01 PM Docket Order), which was filed that evening (Defendants' Opposition to Plaintiff's Motion for Contempt ("Defs.' Opp."), Dkt. 51).

Defendants' response advanced three arguments: (1) Defendants were not using the registered trademarks addressed in the Consent Decree, namely NW NATIONAL WHOLESALE, NATIONAL WHOLESALE LIQUIDATORS, THE HOUSEHOLD WAREHOUSE, and common law trademark SO MUCH FOR SO LITTLE (*id.* at 1–3);[3] (2) trademarks containing words such as "NATIONAL," "WAREHOUSE," "WHOLESALE," and "HOUSEHOLD" were in any event weak and did not cause confusion (*id.* at 2); and (3) Defendants had largely re-branded, including by removing old signage and ordering a new sign bearing the name "USA NATION WAREHOUSE" (*id.* at 2). Defendants also contended that their efforts to comply with the Consent Decree had been frustrated by COVID-19, as the sign store from which they customarily ordered their signs had been intermittently closed due to the pandemic. (*Id.*)

---

[3] Defendants' Opposition did not address the portion of the Consent Decree that prohibits Defendants from using the term "National" or "So Much for So Little." (Defs.' Opp., Dkt. 51.)

Plaintiff filed a reply on February 9, 2021. (Plaintiff's Reply in Support of Motion for Contempt ("Pl.'s Rep."), Dkt. 52.) It also submitted evidence indicating that, contrary to Defendants' Opposition, Defendants remained in violation of the Consent Decree as of February 9, 2021. (*See* Reply Declaration of Noah Rosen ("Rosen Rep. Decl."), Dkt. 52-4, ¶¶ 3–5; Dkts. 52-11, 52-13, 52-14, 52-15.) This evidence included photos of Defendants' continued use of the word "National" in at least some signage and price stickers. (*See* Pl.'s Rep., Dkt. 52, at 7; Dkts. 52-11, 52-13, 52-14, 52-15.) The photos also showed that Defendants had removed the "-AL" from "NATIONAL" on their storefront signs so that the signs read "USA NATION WAREHOUSE," but the shadowy outline of the removed "AL" remained visible on the signs. (*See* Pl.'s Rep., Dkt. 52, at 7; Dkts. 52-3, at ECF 3; Dkts. 52-10, 52-12.)

On March 9, 2021, the Court held a contempt hearing with the parties via videoconference.[4] (*See* 3/9/2021 Minute Entry.) Plaintiff presented exhibits and testimony from Noah Rosen, owner of Plaintiff, and Jagdish Singh, a store manager for Plaintiff.[5] (*Id.*) In addition to the aforementioned photographic evidence of Defendants' violations of the Consent Decree, Plaintiff introduced evidence showing that Defendants' online presence continued to use the term "National" as of March 8, 2021 (*see* Dkts. 55-41, 55-42, 55-43), and that, at times, customers,

---

[4] Near the end of the contempt hearing—after over an hour of disruptive, disrespectful, and frankly, bizarre behavior from defense counsel, Sergei Orel, directed at both the Court and Plaintiff, and after multiple warnings to Orel to modify his behavior, as well as unsuccessful attempts to mute Orel—the Court ejected Orel from the contempt hearing proceedings. (*See* 3/9/2021 Minute Entry.) While Orel's behavior was reprochable, the Court notes that it did not affect the results of this motion, which was determined based on the evidence discussed herein.

[5] Defendants did not introduce any testimony or exhibits at the March 9, 2021 hearing. Amidst his vitriolic, irrelevant, and *ad hominem* attacks on Rosen and Plaintiff generally, defense counsel, Orel, reiterated the argument from Defendants' written opposition that because Defendants had re-branded (as of two weeks before the hearing), no contempt could be found.

vendors, and government agencies had confused Plaintiff and Defendants (*see* Dkts. 55-46–55-52).

The Court found on the record at the hearing that a contempt order was warranted with respect to at least some of Defendants' behavior, and indicated that it would issue a written decision explaining its findings.  (3/9/2021 Minute Entry.)  The Court directed Plaintiff to file a letter on or before March 26, 2021, clarifying the relief that it was seeking.  (*Id.*)  Plaintiff filed that letter on March 26, 2021, requesting additional injunctive relief, an accounting of all profits from April 14, 2020 to the present, publication of a "retraction and apology," daily civil fines to enforce the new injunctive relief in the form of both compensatory fines payable to Plaintiff and graduated coercive fines payable to the Clerk of the Court, compensatory damages in an amount to be determined after the Court has ordered an accounting, and attorneys' fees.  (*See* Letter Motion for Sanctions ("Sanctions Ltr."), Dkt. 57.)

## DISCUSSION

### I.      Contempt

"[T]he power to punish for contempt is inherent in all courts.'"  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (internal quotation marks and citation omitted).  The underlying concern is "disobedience to the orders of the [j]udiciary," not "merely the disruption of court proceedings."  *Id.* (citation omitted).  However, a contempt order is a "potent weapon to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct."  *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (internal quotation marks and citations omitted).

For a contempt order to issue, the "movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."

*Weston Cap. Advisors, Inc. v. PT Bank Mutiara, Tbk*, 738 F. App'x 19, 21–22 (2d Cir. 2018) (summary order) (quoting *King*, 65 F.3d at 1058).

### A.    Defendants' Continued Use of "National" and "So Much for So Little" Merits a Finding of Contempt

Plaintiff has successfully established all three prongs of the contempt standard with regard to Defendants' continued use of the term "National" and of the slogan "So Much for So Little" in their store signage and stickers.

First, Plaintiff has pointed to a "clear and unambiguous" order with which Defendants failed to comply. *Weston Cap. Advisors, Inc.*, 738 F. App'x at 21–22. "An order is 'clear and unambiguous' when it leaves 'no uncertainty in the minds of those to whom it is addressed,' who 'must be able to ascertain from the four corners of the order precisely what acts are forbidden.'" *Nike, Inc. v. Wu*, No. 13-CV-8012 (CM), 2020 WL 257475, at *16 (S.D.N.Y. Jan. 17, 2020) (first quoting *Hess v. N.J. Transit Rail Operations, Inc.,* 846 F.2d 114, 116 (2d Cir. 1988); and then quoting *Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir. 1989), *cert. denied,* 494 U.S. 1030 (1990)).  The parties' Consent Decree, entered by this Court as a "Stipulated Permanent Injunction," could not be plainer.  It unambiguously and specifically prohibits Defendants from using the word "'NATIONAL' singly or as part of a name/mark," in connection with commerce after October 1, 2020, and also provides that Defendants cannot use, among other things, the "common law trademark SO MUCH FOR SO LITTLE." (Consent Decree, Dkt. 42, at ECF 1–3.)  Defendants do not (and, indeed, cannot) allege that this order is in any way unclear or ambiguous.[6]  (*See generally* Defs.' Opp., Dkt. 51.)

---

[6] Defendants' argument that these words and phrases are "weak" trademarks, undeserving of intellectual property protection (*see* Defs.' Opp., Dkt. 51, at 2), is completely irrelevant, as Defendants themselves agreed not to use these words and phrases in the Consent Decree and Settlement Agreement of the underlying action (*see* Consent Decree, Dkt. 42, at ECF 2–3; Settlement Agreement, Dkt. 52-2, ¶ 5).  Defendants were free to litigate the trademark issues in

Second, Plaintiff has provided "clear and convincing" evidence of noncompliance with the order. *Weston Cap. Advisors, Inc.*, 738 F. App'x at 21–22. "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (quotation marks and citation omitted). Here, Plaintiff has provided more than two-dozen photos, dated after October 1, 2020, showing Defendants' use of the word "National" in multiple locations in and in front of their stores, including on storefront signs, placards, advertisements, price stickers, and on the stores' websites and Facebook pages. (*See, e.g.*, Dkts. 44-6, 44-7, 44-8 (October 2020 photos showing storefront signs for "National Warehouse"); Dkts. 44-27, 44-28, 52-11, 52-13 (October 2020 and February 2021 photos showing "National Warehouse" price stickers); Dkts. 44-10, 44-13, 44-14, 44-16, 44-29 (October 2020 photos of in-store placards reading "National Warehouse"); Dkts. 44-24, 52-15 (October 2020 and February 2021 photos of advertisement for "National Eyecare"); Dkts. 55-41, 55-42 (March 2021 screenshots of Facebook posts by Defendants, using term "National Warehouse"); Dkt. 55-43 (March 2021 screenshot of website using term "National Warehouse").) The photos also demonstrate at least two instances in which Defendants continued to use the phrase "So Much for So Little." (*See* Dkts. 44-7, 44-8.) Defendants, moreover, do not dispute the origin or veracity of these photos. (*See generally* Defs.' Opp., Dkt. 51.) Accordingly, the Court finds that the evidence of Defendants' violation is clear and convincing.

Plaintiff has also shown that Defendants have "not diligently attempted to comply in a reasonable manner." *Weston Cap. Advisors, Inc.*, 738 F. App'x at 22. Plaintiff has shown that the

---

the underlying action; instead, they chose to settle the action and bind themselves to a court order directing them not to use these words and phrases. They cannot now unilaterally decide that the agreement to which they consented and which the Court so-ordered is invalid.

violations documented in October 2020 were still in place in January 2021, and indeed, that some were present in February and March 2021.  (*See* Rosen Decl., Dkt. 44-1, ¶ 44; Dkts. 52-10–52-15; Dkts. 55-41–55-43.)  Moreover, it appears that Defendants did not merely fail to conform their pre-existing signage to the requirements of the Consent Decree, but also created new signage after the entry of the Consent Decree that violated it, as evidenced by a photo showing a banner reading "National Eyecare" and also advertising a Black Friday sale.[7]  (*See* Dkt. 44-31.)

Defendants contend, in response, that they were stymied in their efforts to comply by COVID-19.  (*See* Defs.' Opp., Dkt. 51, at 2.)  They submit a declaration from Defendant Ajay Sarin, who stated that Defendants "ha[d] mostly re-branded [their] store[s]," and "ha[d] replaced all of the signs inside [the] store[s]" without indicating a time period during which this was accomplished.  (Declaration of Ajay Sarin, Dkt. 50, ¶¶ 2, 4.)  Defendant Sarin further stated that Defendants had not changed the sign on their stores because Sign Stop, "the sign maker that makes [their] signs . . . ha[d] been mostly closed on and off for several months in 2020 due to the COVID-19 [pan]demic" and suffered from worker shortages.  (*Id.* ¶ 3.)  Upon receipt of the contempt motion, Defendants requested a new sign from Sign Stop "on an emergency basis."  (*Id.* ¶ 5.)

The Court finds Defendants' arguments and evidence unconvincing.  Defendants do not provide any details as to the timeline of their attempts to comply with the Consent Decree, and do not indicate what efforts they made to reach out to Sign Stop before the instant motion was filed.  Nor do they address why they continued to post banners and use stickers with the term "National" and the phrase "So Much for So Little" after October 1, 2020.  And while they argue they were unable to obtain new signage because of the COVID-19 pandemic, Defendants do not address why they failed to simply take down the old signs that violated the Consent Decree, or at least petition

---

[7] In 2020, Black Friday occurred on November 27.

the Court for an extension of time to do so.  Furthermore, the Court notes that the parties submitted the draft Consent Decree to the Court on April 13, 2020, almost a month into the COVID-19 lockdown.  (Proposed Stipulated Consent Decree, Dkt. 41-1.)  This timeline undercuts Defendants' argument that COVID-19 threw a completely unexpected wrench into their plans for compliance with the Consent Decree.  Finally, to the extent Defendants attempted to comply with the Consent Decree *after* the filing of the contempt motion, their efforts do not cure a finding of contempt based on their prior inaction.[8]  *See Aquavit Pharmacueticals v. U-Bio Med, Inc.*, No. 19-CV-3351 (VEC) (RWL), 2019 WL 8756622, at *8 (S.D.N.Y. Dec. 16, 2019) (finding contempt appropriate sanction despite post-motion attempts to cure), *report and recommendation adopted in part sub nom. Aquavit Pharm., Inc. v. U-Bio Med, Inc.*, No. 19-CV-3351 (VEC), 2020 WL 1900502 (S.D.N.Y. Apr. 17, 2020); *Cordius Tr. v. Kummerfeld Assocs., Inc.*, 658 F. Supp. 2d 512, 517 (S.D.N.Y. 2009) (same).

In sum, the Court finds that Defendants should be held in contempt for their failure to comply with the requirements of the Consent Decree, given their continued use of the terms "National" and "So Much for So Little."

## B. Defendants' Continued Use of "NW" and "USA Nation Warehouse" Does Not Support a Finding of Contempt

Plaintiff also argues that Defendants' use of the term "NW" and the name "USA Nation Warehouse" merit a finding of contempt.  (Contempt Mot., Dkt. 44-32, at 10, 13–14; Pl.'s Rep., Dkt. 52, at 10.)  However, the Court finds that Defendants' use of these terms does not violate a

---

[8] The Court also notes that Defendants' interim solution of removing the "-AL" from the word "NATIONAL" on storefront signs at the Rosedale and Co-op Stores does appear to "simply suggest[] to the public that Plaintiff, who the consumers believe owns the Rosedale and Co-Op locations, cannot be bothered to fix its signs when letters fall off."  (*See* Pl.'s Rep., Dkt. 52, at 10 (citing Dkts. 52-10, 52-15).)

"clear and unambiguous" order. *Weston Cap. Advisors, Inc.*, 738 F. App'x at 21.  In addition to prohibiting use of the word "National," the Consent Decree orders Defendants not to use "NW NATIONAL WHOLESALE," "NATIONAL WHOLESALE LIQUIDATORS," "THE HOUSEHOLD WAREHOUSE," and common law trademark "SO MUCH FOR SO LITTLE," or "any reproduction, counterfeit, copy, or colorable imitation of said marks or any confusingly similar marks" in specified ways.  (Consent Decree, Dkt. 42, at ECF 2–3.)  It further directs them not to "[c]ommit[] any actions or omissions calculated to cause consumers to believe that Defendants' goods or services are genuine goods or services of Plaintiff or [NWL]."  (*Id.*)  While the Court does not doubt that use of the terms "NW" and "USA Nation Warehouse" could, under certain circumstances, cause consumers to believe that Defendants' goods and services belonged to Plaintiff, the Court finds that the Consent Decree does not "unambiguously" prohibit the use of either.[9]  *See In re Chief Exec. Officers Clubs, Inc.*, 359 B.R. 527, 537–38 (Bankr. S.D.N.Y. 2007).  On its face, the Consent Decree's prohibition of the term "NW NATIONAL WHOLESALE" (Consent Decree, Dkt. 42, at ECF 2) does not unambiguously indicate that Defendants are forbidden from using the included term "NW."  Indeed, the existence of a separate provision of the Consent Decree addressing the use of the word "National" indicates that the individual words included in the prohibited phrases were not necessarily prohibited on their own.[10]  (*See id.* at ECF

---

[9] The Court's finding on this point is limited to the instant contempt motion—which, as discussed, is subject to a demanding standard—and does not resolve whether Defendants' use of "NW" or "USA Nation Warehouse" violates Plaintiff's trademarks.

[10] Indeed, while Plaintiff's initial Complaint in this action did not address Defendants' in-store use of the term "NW," it did allege that Defendants "adopted corporate names for their stores respectively as 'NW of Rosedale' and 'NW of Co-Op City' in order to be confusingly similar to 'National Wholesale' and 'NWL'" (Complaint, Dkt. 1, ¶ 30), suggesting that Plaintiff was, to some extent, on notice of Defendants' potential use of the term "NW," but that Plaintiff nonetheless failed to negotiate for an explicit provision prohibiting its use in the Settlement Agreement and/or Consent Decree.

2–3); *cf. Saint Laurie Ltd. v. Yves Saint Laurent Am., Inc*., No. 13-CV-6857 (DAB), 2015 WL 12991205, at *9 (S.D.N.Y. Mar. 27, 2015) (applying canon of *expressio unius est exclusio alterius* to trademark agreements).  Because "any ambiguities and omissions in the order are resolved to the benefit of the party charged with contempt," *In re MarketXT Holdings Corp.*, 336 B.R. 39, 51– 52 (Bankr. S.D.N.Y. 2006) (citation omitted), the Court does not find contempt warranted as to Defendants' use of the terms "NW" and "USA Nation Warehouse."

## II.    Remedies

Having found Defendants in contempt with regard to their continued use of the terms "National" and "So Much for So Little," the Court now proceeds to consider the appropriate contempt remedy, and finds appropriate (1) an injunction directing specific performance of the Consent Decree and this Order, including publication of the disclaimer discussed *infra*, with daily graduated fines on Defendants until they fully comply with both, and (2) a grant of attorneys' fees.

Civil contempt sanctions may serve dual purposes, namely "to secure future compliance with court orders and to compensate the party that has been wronged."  *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004) (citations omitted).  However, contempt sanctions may not be imposed punitively, *id.*, and "a court is obliged to use the least possible power adequate to the end proposed," *Spallone v. United States,* 493 U.S. 265, 276 (1990) (citation omitted).

In selecting sanctions, a court should be guided by "the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about compliance, and the contemnor's ability to pay."  *Paramedics*, 369 F.3d at 658 (alteration, quotation marks, and citation omitted).  Where the contempt sanction is coercive, a district court has "broad discretion to design a remedy that will bring about compliance."  *Id.* (citation omitted); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) ("The

14

measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.").

As an initial matter, the Settlement Agreement provides that Plaintiff is "entitled to injunctive relief and specific performance in addition to any and all other necessary remedies, legal and equitable." (Settlement Agreement, Dkt. 52-2, ¶ 11.) It further provides that a breach of the agreement makes "Defendants liable to Plaintiff for any and all damages and injuries incurred by Plaintiff as a result" of breach, and obligates "Defendants to account to Plaintiff and turn over to Plaintiff any and all monies, profits, or other consideration or benefits which Defendants derive from any and all actions or omissions in breach of th[e] Agreement and/or the Consent Decree." (*Id.* ¶ 14.) The Agreement also provides that Defendants will compensate Plaintiff for all attorneys' fees incurred in enforcing the Agreement and/or the Consent Decree. (*Id.* ¶ 16.)

As noted *supra*, Plaintiff seeks as sanctions additional injunctive relief, an accounting of all profits from April 14, 2020 to the present, publication of a "retraction and apology," daily fines that are both compensatory and coercive, compensatory damages in an amount to be determined after the Court has ordered an accounting, and attorneys' fees. (*See* Sanctions Ltr., Dkt. 57.) The Court discusses each request below.

### A.  Modification of the Consent Decree

Plaintiff seeks "an additional injunction which both reiterates the terms of the Consent Decree and specifies that Defendants shall not use the elements 'NATION' or 'NW.'" (*Id.* at 2.) Because, as discussed above, the Court finds that contempt is warranted with regard to Defendants' use of "National" and "So Much for So Little" but not for their use of "NATION" or "NW," the Court declines to alter the terms of the Consent Decree in this way. However, the Court does incorporate and reiterate the terms of the Consent Decree in this Order. Defendants must immediately comply with the terms of the Consent Decree, including by immediately removing

all uses of the term "National" and "So Much for So Little" from their signage, labeling, and online presence.[11]

### B.   Retraction and Apology

Plaintiff also seeks an order compelling Defendants to "publish a retraction and apology to correct their contempt." (Sanctions Ltr., Dkt. 57, at 3.) They propose the following draft apology:

> [W]e hereby inform the public that we are not and never have been affiliated with National Wholesale Liquidators.   We have unlawfully used the trademarks NATIONAL WHOLESALE LIQUIDATORS, NW NATIONAL WHOLESALE, THE HOUSEHOLD WAREHOUSE, SO MUCH FOR SO LITTLE, and marks confusingly similar thereto.  We express our sincere apology to the public and the true owner(s) of those trademarks, who operate National Wholesale Liquidators stores[.]

(*Id.*) The proposed language also includes a list of addresses where Plaintiff operates its stores, as well as the URL of its website.  (*Id.* at 3–4.) Plaintiff does not, however, provide any details as to where Defendants would publish this putative apology, although it does state that district courts may "ensure that the retractions and apologies are disseminated as widely as the offending actions." (*Id.* at 3.)

Plaintiff cites *United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL-CIO*, for the principle that courts may "compel parties to publish retractions and apologies as part of the enforcement of ongoing consent decrees and ensure that the retractions and apologies are disseminated as widely as the offending actions."

---

[11] At the March 9, 2021 hearing, Defendants' counsel seemed to indicate that Defendants had fulfilled the terms of the Consent Decree by replacing the storefront sign that included the word "National."  However, Defendants did not present any evidence of such compliance.  To the extent Defendants' counsel was referring to Defendants' interim step of removing the "-AL" at the end of the existing sign reading "NATIONAL," that is clearly not in compliance with the Consent Decree.  (*See supra* n.7.)  In any event, removal or change of the storefront sign is but one of the multiple steps Defendants must take to comply with the Consent Decree, including conforming their in-store signage, labels, and online presence.

(Sanctions Ltr., Dkt. 57, at 3 (citing 782 F. Supp. 243, 252 (S.D.N.Y. 1992)).)  The Court does not find this case particularly relevant or compelling.  In *Teamsters*, the government brought suit against the International Brotherhood of Teamsters, claiming that members were knowingly associating with La Cosa Nostra.  782 F. Supp. at 244.  The parties settled, and the presiding court entered a consent decree providing for independent monitoring of the Teamsters' elections.  *Id.* Certain incumbents whom the independent monitor had barred from running then "made a number of objections and unsubstantiated, outrageous statements about the Independent Administrator's conduct in connection with the [] election."  *Id.* at 246.  The presiding court ordered the incumbents, among other things, to issue an apology for those "outrageous statements."  *Id.* at 252. The instant case, in contrast, involves no outrageous, libelous statements of the sort at issue in *Teamsters*.  As such, the Court does not find an apology to be necessary at this time.

However, the Court does find that a disclaimer is an appropriate remedy in the instant circumstances.  The Court has "broad discretion to design a remedy that will bring about compliance" with the terms of the Consent Decree, *see Paramedics,* 369 F.3d at 658 (citation omitted), including the Consent Decree's provision preventing Defendants from "[c]ommitting any [] actions or omissions calculated to cause consumers to believe that Defendants' goods or services are genuine goods or services of Plaintiff or [NWL]" (Consent Decree, Dkt. 42, at ECF 3).  Disclaimers are common remedies used in trademark infringement actions to distinguish an infringing product from a trademarked one.  *See*, *e.g.*, *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 273 (2d Cir. 2011) ("Given the district court's great flexibility in fashioning relief [in trademark cases], we have frequently recognized that the use of a disclaimer sign can, in the right circumstances, be appropriate relief." (internal citations omitted)); *Home Box Off., Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1315–16 (2d Cir. 1987) ("In many

circumstances[,] a disclaimer can avoid the problem of objectionable infringement by significantly reducing or eliminating consumer confusion by making clear the source of a product." (citing *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325 (2d Cir. 1987))). "Whether [] a disclaimer is appropriate depends on the circumstances of the relevant business and its consumers." *Patsy's Italian Rest.*, 658 F.3d at 374 (internal quotation marks and citation omitted).

Here, Plaintiff's request for a "retraction and apology" in many ways resembles a request for a disclaimer. In effect, beyond an apology, Plaintiff's request is that Defendants clarify publicly that they are not affiliated with Plaintiff. The Court finds that in the instant case, where only a handful of discrete instances of confusion have been demonstrated, a disclaimer may be sufficient "to avoid substantially the risk of consumer confusion."[12] *Home Box Off., Inc.*, 832 F.2d at 1315. The Court also finds that such a disclaimer will likely be more effective in eliminating or preventing ongoing or future confusion than a general one-time published apology. It therefore orders Defendants, in addition to complying with the Consent Decree, to put up signs behind the cash registers at their stores reading: "Not affiliated with National Wholesale Liquidators." Defendants must also include this disclaimer in their online presence, as part of their websites and social media pages, and as a disclaimer on their corporate emails with customers, vendors, and regulators. The disclaimer must be easily readable, and must not be in smaller font than the rest of the email or website.

---

[12] The Court notes that it is generally the responsibility of an infringer to establish the effectiveness of a disclaimer. *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 143–44 (2d Cir. 2005) ("Where . . . an infringer attempts to avoid a substantial likelihood of consumer confusion by adding a disclaimer, it must establish the disclaimer's effectiveness." (footnote and citations omitted)). Here, however, it is Plaintiff who is in effect requesting the disclaimer, and therefore the Court assumes that Plaintiff does not dispute the effectiveness.

C.    **Accounting / Compensatory Fines**

In contempt proceedings, the court "has the authority to award the injured party compensatory damages for injuries suffered as a result of the contempt." *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F. Supp. 2d 276, 299 (S.D.N.Y. 2009) (citation omitted); *see also Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund v. Vintage Flooring & Tile, Inc.*, No. 11-CV-1316 (PKC), 2012 WL 2958177, at *2 (S.D.N.Y. July 20, 2012) ("Where a fine is to be paid to the opposing party, 'the sanction should correspond at least to some degree with the amount of damages.'" (quoting *King,* 65 F.3d at 1062)).  Upon a finding of contempt in trademark cases, courts often award "the net profits [the] defendants earned from selling [] [m]erchandise in violation of the [Injunction] Order." *See Nat'l Basketball Ass'n v. Design Mgmt. Consultants*, 289 F. Supp. 2d 373, 378 (S.D.N.Y. 2003) (citing *Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd.*, 885 F.2d 1, at 7 (2d Cir. 1989)).  Here, however, there is no one infringing product; rather, Plaintiff contends that some portion of Defendants' profits have resulted from Defendants being confused for Plaintiff, or that Plaintiff has suffered some as-yet unknown amount of damages due to its association with Defendants.  Because Plaintiff has failed to demonstrate any actual damages—based on isolated instances of confusion—the Court declines to order Defendants to provide an accounting.  Even if Defendants were to provide such an accounting, the Court would have no way of determining what amount, in absolute terms or as a percentage of Defendants' sales, constituted sales that Plaintiff lost due to confusion.  The Court therefore denies Plaintiff's request for an accounting and instead awards attorneys' fees as compensation. *See Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Techs., Inc.*, No. 02-CV-9369 (DFE), 2004 WL 1810597, at *4 (S.D.N.Y. Aug. 12, 2004) (calculating damages for a period of

contempt by reference to the attorneys' fees accrued by the party seeking to find the other party in contempt).[13]

### D.    Coercive Fines

Plaintiff also requests that the Court institute coercive fines to ensure Defendants' compliance with the Court's instant order.

> Factors considered in determining whether to impose coercive sanctions include "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probabl[e] effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him."

*Aquavit*, 2019 WL 8756622, at *9 (quoting *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987)).

The Court does not find that the character and magnitude of the harm threatened by the continued contumacy is severe, as Plaintiff has not shown significant damages in this case. However, the Court believes that a monetary penalty will be the most effective tool in ensuring Defendants' hitherto elusive compliance with the Court's orders.[14]   Accordingly, the Court uses its "broad discretion," *Paramedics,* 369 F.3d at 658, to implement "a modest but increasing daily coercive fine" upon Defendants, *Scalia v. Cty. Serv. Transportation Inc*., No. 20-MC-32 (LJV) (JJM), 2021 WL 776981, at *2 (W.D.N.Y. Mar. 1, 2021).   Defendants shall pay a $100 per day

---

[13] Plaintiff asserts that it has "proved the existence of actual damages in the form of customer confusion and Plaintiff's time lost in correcting confusion by customers, vendors, and regulators" and that it has established the loss of attorney fees. (Sanctions Ltr., Dkt. 57, at 4.)  The Court finds that while Plaintiff has indeed established instances of customer, vendor, and regulator confusion, any resulting damages at this point are merely speculative.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 239 (S.D.N.Y. 2012).  Its losses in attorney fees, however, are not, as discussed *infra*.

[14] Because Defendants have not provided any information about their financial situation in their briefing, the Court cannot assess the seriousness of the burden placed by any monetary sanction.  The Court therefore sets the fee at the modest rates indicated above.

fine during the first 14 days after this order is served; a $200 per day fine beginning on day 15; and a $400 per day fine beginning on day 31 and continuing until they have complied fully with the Consent Decree and with the terms of this Memorandum and Order.

### E.    Attorneys' Fees

Lastly, Plaintiff also seeks an award of attorneys' fees expended in pursuing the instant contempt motion.  Generally, in contempt proceedings, "[t]he decision to award fees rests in the court's equitable discretion."  *Gucci Am., Inc. v. Li*, No. 10-CV-4974 (RJS), 2015 WL 7758872, at *4 (S.D.N.Y. Nov. 30, 2015) (quoting *Crescent Publ'g Grp., Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 147 (2d Cir. 2001)).  Courts in this Circuit will "award the reasonable costs of prosecuting the contempt, including attorney's fees, only where violation of a court order is found to have been willful," *Zino Davidoff SA v. CVS Corp.*, No. 06-CV-15332 (RJS), 2008 WL 1775410, at *7 (S.D.N.Y. Apr. 17, 2008), although the Second Circuit has "commented that '[it] express[es] no opinion [on the claim] that a finding of willfulness or bad faith is required before a court may order attorneys' fees as a sanction for violating a court order, and note[d] that the issue appears to remain an open one in [this] Circuit,'" *Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 2462333, at *4 n.2 (S.D.N.Y. June 13, 2019) (third alteration in original) (quoting *Jacobs v. Citibank, N.A.*, 318 F. App'x 3, 5 n.3 (2d Cir. 2008) (summary order)).

In this case, however, the Court need not make a finding of willfulness, because the terms of the Consent Decree provide that "Defendants shall compensate Plaintiff for all attorneys' fees Plaintiff may incur in enforcing [the Consent] Decree, the Settlement Agreement, and their terms." (Consent Decree, Dkt. 42, at ECF 4.)  Plaintiff has submitted an affidavit from counsel with detailed billing information, representing that Plaintiff accrued $23,187.88 in fees and costs as part of the instant motion.  (*See* Dkt. 57-1, ¶ 18.)  That figure represents approximately 65 hours of work by Kyle Seiss, Plaintiff's counsel, charged at an hourly rate of $350 for a total of $22,750,

21

along with $437.88 in transcript fees for the March 9 hearing. (*Id.* ¶¶ 10, 13, 15–16; *see also* Dkt. 57-2.)

The Court finds that Defendants should not be held responsible for the full amount of attorneys' fees accrued by Plaintiff, however, as the time expended by Plaintiff's counsel on seeking contempt for Defendants' use of the terms "NW" and "Nationwide" was not time spent "enforcing [the Consent] Decree, the Settlement Agreement, and their terms." (Consent Decree, Dkt. 42, at ECF 4.) It is impossible to determine from the billing records submitted which entries correspond to work on "NW" and "Nationwide" as opposed to "National" and "So Much for So Little." (*See* Dkt. 57-2.) The Court estimates, however, that work on those elements corresponded to roughly one quarter (1/4) of Plaintiff's counsel's total billing. As a result, the Court reduces the amount of attorneys' fees to $17,062.50, for an award of $17,500.38 overall.[15]

## CONCLUSION

For the reasons stated above, the Court grants Plaintiff's motion for contempt with respect to Defendants' continued use of the terms "National" and "So Much for So Little," but denies it with respect to Defendants' use of the terms "NW" and "Nationwide." Accordingly, Defendants are ordered to comply immediately with the terms of the Consent Decree, and also to post and

---

[15] Because only a minimal amount of time at the March 9, 2021 hearing was spent discussing whether Defendants' use of "NW" and "National" violated the Consent Decree, the Court does not find it necessary to reduce the overall cost of the hearing transcript. Further, the Court assesses the $437.88 cost of the transcript even though the Consent Decree specifies only recovery of attorneys' "fees," because "[r]easonable out-of-pocket expenses are generally reimbursed as a matter of right in connection with an award of attorneys' fees." *Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 305 (E.D.N.Y. 2012); *see also Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987) ("[A]ttorney's fees include expenses that are incidental and necessary to the representation, provided they are reasonable." (quotations omitted)).

issue the disclaimer described herein.  The Court further directs Defendants to pay the following

graduated fees to the Clerk of Court: a $100 per day fine during the first 14 days after this order is

served; a $200 per day fine beginning on day 15; and a $400 per day fine beginning on day 31 and

continuing until Defendants have complied fully with the Consent Decree and with the terms of

this Memorandum and Order.  Lastly, the Court also awards Plaintiff attorneys' fees and costs in

the amount of $17,500.38.  Defendants are directed to file updates on their compliance with the

Consent Decree and with this Memorandum and Order every fourteen (14) days until they have

completely complied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 14, 2021
　　　 Brooklyn, New York